**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LANCE WILLIAMS,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | Civil Action No. 3:20-CV-3222-M-BH |
| | § | |
| **KILOLO KIJAKAZI, ACTING** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge[1] |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claim for social security benefits should be **AFFIRMED**.

## I.      BACKGROUND

Lance Williams (Plaintiff) filed his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act on February 11, 2020, and September 12, 2017, respectively, alleging disability beginning June 8, 2017. (doc. 24-1 at 52-53.)[2] His claims were denied initially on January 26, 2018, and upon reconsideration on June 1, 2018. (*Id.* at 97, 106). After requesting a hearing before an Administrative Law Judge (ALJ), he appeared and testified on January 31, 2020. (*Id.* at 50, 110.) On May 22, 2020, the ALJ issued a partially favorable decision finding that Plaintiff had not been disabled from his alleged onset date of June 8, 2017, through June 5, 2018, because he "was capable of making a successful adjustment to other work that existed in significant numbers in the

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

national economy", but that he became disabled on June 6, 2018, and had continued to be disabled through the date of her decision. (*Id.* at 15, 28-29.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on June 18, 2020. (*Id.* at 148.) The Appeals Council denied his request for review on September 21, 2020, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 4-8.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A. Age, Education, and Work Experience

Plaintiff was born on June 6, 1968; he was 51 years old at the time of the hearing. (doc. 24-1 at 34.) He had completed high school, obtained an associate degree in electronic telecommunications, and could communicate in English. (*Id.* at 57.) He had past relevant work as an HVAC installer or technician. (*Id.* at 55, 58.)

## B. Medical, Psychological, and Psychiatric Evidence

On June 8, 2017, Plaintiff presented to the emergency room at Baylor University Medical Center (Baylor) after being injured by a drunk driver. (*Id.* at 55, 245, 271.) A computed tomography (CT) scan revealed moderate spondylosis of the cervical spine, moderate osteoarthritic changes in his right knee, multiple surgical screws within the distal femur and proximal tibia, and an acute extra-articular transverse fracture of the mid fibular diaphysis. (*Id.* at 254, 266, 268.) He was diagnosed with a midshaft fracture of his right fibular, prescribed Norco, and instructed to use crutches and cold packs to decrease the pain and swelling. (*Id.* at 284.) He was discharged the same day in stable condition with an orthopedic referral. (*Id.* at 275, 284.)

On June 14, 2017, Plaintiff presented to Baylor Scott & White Orthopaedic Trauma Associates of North Texas (OTANT) with pain in his right ankle, for which he was taking hydrocodone-acetaminophen. (*Id.* at 292.) He had pain with range of motion of the ankle and

circumferential soft tissue swelling around the ankle; there was a deep wound over the medial malleolus with no exposed bone and tenderness to palpation over the medial and lateral ankle. (*Id.* at 293.) Casey Cates, M.D., noted Plaintiff's previous knee arthroscopy and recommended operative intervention. (*Id.* at 292-93, 499.) Days later, Plaintiff underwent ankle surgery. (*Id.* at 499.)

Between June 21, 2017, and November 29, 2017, Plaintiff returned to Dr. Cates for follow up visits. (*Id.* at 487-98.) He had pain but no fevers or chills, and his wound appeared "healthy" and improved "significantly" over the course of his visits. (*Id.* at 490-91, 493.) Imaging indicated his hardware was stable, and his mortise was symmetric. (*Id.*) Plaintiff was instructed to perform wound care at home. (*Id.*) His ankle improved, but he continued to have knee pain. (*Id.* at 487-88.) He was diagnosed with chronic right knee pain and ankle syndesmosis disruption and instructed to follow up as needed. (*Id.* at 487.)

On January 19, 2018, Laurence Ligon, M.D., a state agency medical consultant (SAMC), noted Plaintiff's hospitalization for internal fixation of a fracture of his right fibular; he also noted that there was no follow-up in the file, and that Plaintiff had failed to attend his consultative examination. (*Id.* at 79.) Dr. Ligon concluded there was "insufficient evidence" for a disability determination. (*Id.* at 79-80, 82.)

On March 25, 2018, Plaintiff presented to Parkland Health and Hospital System (Parkland) for left knee pain or injury. (*Id.* at 363.) He endorsed increased sharp pain after jumping out of a truck bed and landing on his left foot; he ambulated and did not have fever or swelling. (*Id.*) He was given a knee immobilizer, prescribed naproxen for pain, and referred to an orthopedist. (*Id.*)

On May 8, 2018, Timothy Gordon Schacherer, M.D., at Parkland's Shoulder Clinic, noted that Plaintiff had severe right shoulder pain constantly and "very" compromised function with

limited flexion, abduction, and external and internal rotation. (*Id.* at 476-77.) Dr. Schacherer recommended a reverse total shoulder arthroplasty. (*Id.* at 477.)

On May 31, 2018, SAMC Craig Billinghurst, M.D., noted that Plaintiff and his "appointed representative" had failed to complete and return Form SSA-827[3], and he found there was insufficient evidence to evaluate his claim. (*Id.* at 87-88, 91.)

On August 29, 2018, and September 12, 2018, Plaintiff returned to Parkland, complaining of right shoulder pain. (*Id.* at 345, 352.) He was diagnosed with chronic right shoulder pain and hypothyroidism and referred to an orthopedist. (*Id.* at 344, 354-55.)

On October 16, 2018, Plaintiff underwent a magnetic resonance imaging (MRI) of his right shoulder. (*Id.* at 340.) It revealed severe acromioclavicular and glenohumeral joint osteoarthritis, rotator cuff tearing and tendinosis, biceps tendinosis, and quadrilateral space syndrome. (*Id.*) On October 24, 2018, and December 5, 2018, Plaintiff returned to Parkland for treatment of right shoulder pain and hepatitis C. (*Id.* at 329, 335.)

On December 28, 2018, Ali Ghazanfar, M.D., treated Plaintiff for shoulder pain. (*Id.* at 323.) He reported that moving his arm above his shoulder aggravated the pain, while rest and medication alleviated it. (*Id.*) Dr. Ghazanfar recommended regular exercise and medication compliance. (*Id.* at 325.)

On December 31, 2018, Christian Antonio Mayorga, Jr., M.D., diagnosed Plaintiff with chronic hepatitis C, which warranted treatment to prevent progression to cirrhosis and associated complications. (*Id.* at 318-19.)

On March 27, 2019, Kendall Taylor Anigian, M.D., performed a physical examination of

---

[3] Form SSA-827 is an authorization for the disclosure of information to the Social Security Administration (SSA), including medical information. *See* Form SSA-827, available at www.ssa.gov/online/ssa-827.pdf.

Plaintiff's right shoulder and opined that rotator cuff repair would not likely solve his problem due to osteoarthritis. (*Id.* at 470, 472-73.) Plaintiff asked for a referral to a shoulder replacement specialist; he was advised to continue the home exercise program and non-steroidal anti-inflammatory drugs. (*Id.*)

On July 10, 2019, Plaintiff underwent a right reverse total shoulder arthropathy with no complications. (*Id.* at 447.) His pain was controlled by medication, he was tolerating a regular diet, and he was ambulating without assistance at discharge the next day. (*Id.*) On July 31, 2019, Dr. Schacherer noted that he was "doing fine" and that the surgical wound had "nicely" healed. (*Id.* at 442.) Plaintiff was referred for physical therapy, given a 6-week follow-up, and prescribed Norco. (*Id.* at 441-42.) On August 9, 2019, he presented for physical therapy, which was recommended weekly for three months. (*Id.* at 437-38.)

On September 11, 2019, Dr. Schacherer opined that Plaintiff seemed to be "doing okay" and could touch the back of his head, but his internal rotation was still "a little bit" tight around the posterior superior iliac spine. (*Id.* at 431-32.) He though Plaintiff would not be able to return to work for several months and possibly not return to "extremely heavy" activity. (*Id.* at 432.)

On September 20, 2019, Plaintiff reported he had done well since his right shoulder surgery and requested a referral for treatment of his hepatitis. (*Id.* at 419-20.) He was diagnosed with hypothyroidism and chronic hepatitis. (*Id.*) He completed his hepatitis C treatment evaluation on October 10, 2019, and returned to Parkland on November 13, 2019, for preventative care. (*Id.* at 403, 411-17.)

On December 3, 2019, Sarah Marie Zannoni, PA-C, examined Plaintiff for left shoulder pain. (*Id.* at 398-99.) He had range of motion secondary to pain and tenderness over both lateral and anterior aspect. (*Id.* at 398.) Imaging of his right shoulder revealed degenerative changes and

a small subacromial spur. (*Id.* at 399, 401.) Further imaging on January 9, 2020, again revealed degenerative changes, as well as synovial thickening, a high-grade partial tear distally, tendinosis distally in his infraspinatus, and moderate tendinosis in his subscapularis. (*Id.* at 503-04.)

On March 3, 2020, Plaintiff underwent an orthopedic examination by Ronnie D. Shade, M.D., who opined that in an 8-hour workday, Plaintiff could sit for 20 minutes at one time and up to 4 hours total, stand for 15 minutes at one time and up to 1 hour, and walk for 15 minutes at one time and up to 1 hour. (*Id.* at 505, 509.) He could occasionally balance and climb stairs and ramps, never lift or carry any weight or stoop, kneel, crouch, crawl, or climb ladders or scaffolds. (*Id.* at 508, 511.) Plaintiff could also occasionally finger and feel with his left hand, but never handle, push, pull, or reach overhead or in any other direction. (*Id.* at 510.) With his right hand, he could occasionally handle and frequently finger, feel, and reach in all directions (except overhead) and never push or pull. (*Id.*) He could frequently operate foot controls with the bilateral feet; tolerate "moderate (office)" noise; occasionally tolerate exposure to moving mechanical parts, unprotected heights, operation of a motor vehicle, humidity, wetness, dust, odors, fumes, and pulmonary irritants; but never tolerate exposure to extreme temperatures or vibrations. (*Id.* at 510, 512.)

Dr. Shade concluded that Plaintiff could climb a few steps at a reasonable pace with the use of a single handrail; prepare a simple meal; feed himself; sort, handle, or use paper; and ambulate without using a wheelchair, walker, or 2 canes or 2 crutches.[4] (*Id.* at 509, 513, 516-18.). (*Id.* at 513, 515-18.) He could never go shopping, travel without a companion, use standard public transportation, or walk a block at a reasonable pace on rough or uneven surfaces. (*Id.* at 513.) These limitations were first present in 2017 and would last for 12 consecutive months. (*Id.*)

---

[4] Dr. Shade noted that Plaintiff used a cane and opined that it was medically necessary. (doc. 24-1 at 509.)

6

C. **Hearing**

On January 31, 2020, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 50-75.) Plaintiff was represented by an attorney. (*Id.* at 53.)

*1.     Plaintiff's Testimony*

Plaintiff testified he had not been working, had no minor children and lived with his sister, a nephew, a niece, and his retired parents, who paid the bills. (*Id.* at 56-57.) Although someone had driven him to the hearing, he had a driver's license and drove at least once a day. (*Id.* at 57.) The morning of the hearing, Plaintiff had taken his medications, including Levothyroxine, Mavret,[5] an unspecified blood pressure medication, and pain medication, which he took only in the evenings. (*Id.* at 59-60.) Only his pain medication had side effects. (*Id.* at 60.)

Plaintiff had worked as an HVAC technician at Pleasant Valley Air, Extreme Comfort, and AUS Air. (*Id.* at 57-58.) He returned to work at AUS Air for 3 or 4 months after his ankle surgery, but then his right shoulder started "giving out." (*Id.* at 58.) He had done home exercises and rehabilitation on it and planned to have surgery on his left shoulder, which hurt. (*Id.* at 59.) He had surgery on his right ankle, which hurt after the screws broke, in November 2017, and only had 70 percent mobility in it. (*Id.* at 60-61.)

Plaintiff had osteoporosis and arthritis in his knees. (*Id.* at 61.) His right knee had screws and limited mobility, and his right leg, which was one quarter inch shorter than the other, affected how far he could walk and how much pain he felt. (*Id.* at 61-62.) Although he stood and walked the entire time when he worked as an HVAC installer, he could only do that for 10 to 15 minutes before he felt pain and needed to sit. (*Id.* at 62-63.) He later stated he could stand or walk up to 2

---

[5] Plaintiff took Mavret for hepatitis C; he had one week left of the medication. (doc. 24-1 at 60.)

hours out of an 8-hour workday before he started to feel pain. (*Id*. at 63.)

Plaintiff, who was right-handed, had sustained a tear in his right shoulder while playing basketball when he was younger. (*Id.* at 63, 66.) The more he used it, the more tears he got. (*Id.* at 64.) He ultimately had a right reverse total shoulder arthroplasty, which removed some muscles or ligaments and prevented him from lifting his arm. (*Id.*)

Plaintiff initially testified that he could reach his right arm "straight out in front of [him]" "at shoulder length" for 2 hours a day, but then stated he could no longer do that with either arm, like when he was an HVAC installer. (*Id.* at 65-66.) He could reach his right arm in front of him to grab the refrigerator door, but it hurt "at times", and he could not do it "over and over". (*Id.* at 65.) Physical therapy would increase the strength, but not mobility, in his shoulders. (*Id.*) "[M]aybe" once or twice a day, he could pick up and carry 15 pounds for about 100 feet, but he could not do it "repetitively", and carrying it for 2.5 hours a day would be "[p]ushing it." (*Id.* at 66-67.) Plaintiff had discussed having a left reverse arthroplasty with his doctor, but first he needed an MRI. (*Id.* at 66.) He also had lower back pain and leg and joint issues. (*Id.* at 67.)

Every day, Plaintiff ate breakfast, spent time with his nephew and niece, watched television, and helped around the house, including by cooking and doing laundry. (*Id.* 67-68.) He was sufficient with his personal needs but had problems with dressing. (*Id.* at 68.) Handles had been installed in his bathroom because he had fallen and was unstable "[s]ometimes." (*Id.*)

### 2.    VE's Testimony

The VE testified that Plaintiff had past work as an air conditioning installer and servicer (DOT 637.261-014, medium work, SVP-7).[6] (*Id.* at 69-70.)

---

[6] DOT stands for the Dictionary of Occupational Titles, and SVP stands for Specific Vocation Preparation.

The VE considered a first hypothetical individual who was 49 years old, had at least a high school education and Plaintiff's past relevant work, and was limited to light exertional work, as defined in the regulations, limited to occasionally push and/or pull; occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel and crouch, but never crawl; occasionally reach overhead, but frequently in all other directions; and avoid exposure to extremes of heat and unprotected heights. (*Id.*) The individual could not perform Plaintiff's past work but could work as a small product assembler (DOT 706.684-022, light work, SVP-2), with 70,000 jobs nationally; machine tender (DOT 754.685-014, light work, SVP-2), with 64,000 jobs nationally; and bench assembler (DOT 706.684-042, light work, SVP-2), with 52,000 jobs nationally. (*Id*. at 70-71.)

The second hypothetical individual had the same limitations as the first but was limited to sedentary work, as defined in the regulations. (*Id.* at 71.) The individual could not perform Plaintiff's past work but could work as a document preparer (DOT 249.587-018, sedentary, SVP-2), with 42,000 jobs nationally; food and beverage order clerk (DOT 209.567-014, sedentary SVP-2), with 43,000 jobs nationally; and call out operator (DOT 237.367-014, sedentary, SVP-2), with 47,000 jobs nationally. (*Id.*) There were no transferable skills. (*Id.* at 71-72.)

The third hypothetical individual, who had a combination of medical conditions, associated symptoms, and need for treatment, would need unscheduled work breaks, resulting in off-task time of more than 15 percent of the workday or workweek. (*Id.* at 72.) The individual could not perform Plaintiff's past work, and there were no occupations for an individual with these limitations. (*Id.*)

The last hypothetical individual, like the third, had a combination of conditions, symptoms, and need for treatment, and would be absent from work more than two days per month. (*Id.*) There were no occupations for an individual with these limitations. (*Id.*)

Because they were not addressed by the DOT, the VE's testimony regarding off-task behavior, absences and overhead reaching was based on his education, training and experience. (*Id.* at 72-73.)

### D. <u>ALJ's Findings</u>

The ALJ issued a partially favorable decision on May 22, 2020. (*Id.* at 15.) At step one, she found that Plaintiff had met the insured status requirements through March 31, 2021, and had not engaged in substantial gainful activity since the alleged onset date of June 8, 2017. (*Id.* at 22.) At step two, the ALJ found the following severe impairments: "degenerative joint disease of the bilateral knees status post right knee surgery, status post open reduction internal fixation surgery of the right syndesmosis, degenerative disc disease of the lumbar spine with nondisplaced fracture, degenerative disc disease of the cervical spine, right shoulder osteoarthritis and rotator cuff tear status post total reverse arthroplasty, and left shoulder osteoarthritis." (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 23.) She specifically considered Listing 1.02 (major dysfunction of joint(s) due to any cause), Listing 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), and Listing 1.04 (disorders of the spine). (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), limited to occasionally push and/or pull; occasionally reach overhead and frequently in other directions; frequently handle; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch, but never crawl; and avoid exposure to extremes of heat and unprotected heights. (*Id.*) At step four, the ALJ determined that Plaintiff was unable to perform his past work.

(*Id.* at 27.)

At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled regardless of whether he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.*) The ALJ determined that Plaintiff had not been disabled, as defined by the Social Security Act, from his alleged onset date of June 8, 2017, through June 5, 2018, but that he had become disabled on June 6, 2018, and continued to be disabled through the date of her decision. (*Id.* at 29.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.        ISSUE FOR REVIEW

Plaintiff lists one issue for review:

> The ALJ failed to properly find the Plaintiff was disabled prior to June 6, 2018 because there was no legitimate medical basis for the ALJ's found RFC, no medical doctor reviewed all of the medical evidence before the ALJ and the ALJ erroneously rejected the only medical opinions within the administrative record without a proper analysis.

(doc. 27 at 5.)

### A.  <u>Medical Source Opinion</u>[7]

Plaintiff first argues that the ALJ erroneously rejected Dr. Shade's medical opinions without addressing "supportability". (doc. 27 at 11, 13-16.) Commissioner responds that the ALJ

---

[7] Plaintiff's issue regarding the ALJ's consideration of Dr. Shade's medical opinion implicates whether the RFC assessment was based on substantial evidence. It is therefore addressed first because its resolution impacts the resolution of other issues.

did not reject Dr. Shade's opinion but instead found it partially persuasive. (doc. 29 at 8.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from his medical sources." *Id.* §§ 404.1520(a)(3), 404.1520c(a).[8] A medical opinion is a statement from a medical source about what the claimant can still do despite his impairment(s) and whether he has one or more impairment-related limitations or restrictions in the following abilities:

(i)    his ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii)   his ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii)  his ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv)   his ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* § 404.1513(a)(2)(i)-(iv).

The guidelines provide that the ALJ will explain in her determination or decision how persuasive she finds "all of the medical opinions and all of the prior administrative medical

---

[8] On January 18, 2017, the SSA updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a)) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed his application after the effective date, the new 2017 regulations apply.

findings in [the] case record." *Id.* § 416.920c(b). Five factors are considered in evaluating the persuasiveness of the medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant[9]; (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." *Id.* § 404.1520c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability[10] and consistency[11]. *Id.* § 404.1520c(a). The ALJ will "explain how [sh]e considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." *Id.* § 404.1520c(b)(2). She may, but is not required to, explain how she considered the remaining factors. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

When a medical source provides multiple medical opinions, the ALJ will articulate how she "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors", but she is not required to articulate how she considered each medical opinion or prior administrative medical finding from one medical source individually. *Id.* § 416.920c(b)(1). Although the ALJ evaluates the persuasiveness of the opinions and diagnoses of treating physicians when determining disability, the sole responsibility for a

---

[9] This factor combines consideration of the (i) length of treatment relationship; (ii) frequency of examinations; (iii) purpose of the treatment; (iv) extent of the treatment relationship; and (v) examining relationship. 20 C.F.R. § 404.920c(c)(3)(i)-(v).

[10] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ..., the more persuasive the medical opinions ... will be." 20 C.F.R. § 404.1520c(c)(1).

[11] "The more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." 20 C.F.R. § 404.1520c(c)(2).

disability determination rests with the ALJ. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1520c(c)(1)-(5), she specifically stated she considered the opinion evidence and prior administrative medical findings in accordance with the requirements of 20 C.F.R. §§ 416.1520c, 416.920c, and she specifically considered supportability and consistency, the two most important factors in evaluating the persuasiveness of medical opinions. (*See id.* at 24, 26-27.) In particular, she noted that Dr. Shade supported his opinion with a physical examination of Plaintiff and a review of imaging of his lumbar spine and bilateral knees. (*Id.* at 26 (citing *id.* at 505.)) She found that Dr. Shade's opinion about Plaintiff's inability to lift any weight or to stoop and his severe upper extremity limitations was inconsistent with Plaintiff's own testimony that he prepared simple meals, helped with household chores, and drove. (*Id.* at 26-27 (comparing *id.* at 508, 510, with *id.* at 57, 67-68.)) She found that Dr. Shade's opinion provided "some" support for the RFC, which was supported by the longitudinal evidence of record. (*Id.* at 27.) Because the regulations require only that the ALJ "explain how she considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in her determination or decision," she properly evaluated Dr. Shade's physical assessment. 20 C.F.R. § 404.1520c(b)(2); *see Gentry v. Saul*, No. 3:19-CV-778, 2020 WL 5100848, at *8 (M.D. Tenn. Aug. 10, 2020), *report and recommendation adopted sub nom. Gentry v. Soc. Sec. Admin.*, No. 3:19-CV-00778, 2020 WL 5096952 (M.D. Tenn. Aug. 28, 2020) (finding that the ALJ properly evaluated the opinions of the plaintiff's treating physician where he specifically found that physician's opinion was not supported by his treatment records or the objective medical evidence and was inconsistent with the plaintiff's medical records).

16

The ALJ's reasons for finding Dr. Shade's opinion only "partially persuasive", combined with her review and analysis of the objective record, satisfy her duty under the regulations. She detailed the reasons why she found the overall evidence (including Dr. Shade's physical and imaging assessment, the objective medical evidence, and the course of treatment) unsupported and inconsistent with Plaintiff's subject allegations of disabling limitation. *See Footman v. Saul*, No. 1:19-CV-1200, 2020 WL 6728937, at *11 (M.D.N.C. Nov. 16, 2020) (finding that the language in the ALJ's discussion makes clear that her "analysis comports with the new regulations, as she properly considered the supportability and consistency of [the nurse practitioner's] opinions, as well as disregarded [her] opinion that [the] [p]laintiff lacked the ability to work as a matter reserved to the Commissioner."). Therefore, the ALJ properly considered Dr. Shade's opinions.

Because the ALJ properly considered Dr. Shade's opinions, and her RFC determination was based on the medical evidence in the record, her RFC determination is supported by substantial evidence. *See Swingle v. Comm'r of Soc. Sec. Admin.*, No. 6:20-CV-365-ORL-MCR, 2020 WL 6708023, at *5 (M.D. Fla. Nov. 16, 2020) (finding that the ALJ properly addressed the supportability and consistency factors and because his RFC determination was based on medical evidence in record, it was supported by substantial evidence). Remand is not warranted on this issue.[12]

**B.   RFC Determination**

Plaintiff argues that "there were no medical opinions to support the … RFC", "the record

---

[12] Plaintiff also argues that the ALJ failed to conduct a proper analysis of Dr. Shade's opinion because she failed to address the factor of "specialization". (doc. 27 at 16.) Because she was not required to explain how she considered "specialization" under 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2), the ALJ did not err, and remand is not warranted on this basis.

as a whole was not considered". (doc. 27 at 11.) The Commissioner responds that substantial evidence supports the ALJ's RFC assessment. (doc. 29 at 3.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

18

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and "[a]fter careful consideration of the entire record", the ALJ determined that Plaintiff had the RFC to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), limited to occasionally push and/or pull, occasionally reach overhead, frequently handle and reach in other directions, occasionally climb ramps and stairs (but never climb ladders, ropes, or scaffolds), occasionally balance, stoop, kneel, and crouch (but never crawl), and avoid exposure to extremes of heat and unprotected heights. (doc. 24-1 at 23.)

The ALJ noted Plaintiff's alleged symptoms, including "difficulties performing exertional and postural activities", pain and numbness, limitations on how much weight he could lift or carry, his "various treatment modalities", physical therapy, medication management, and the use of a cane and braces. (*Id.* at 24 (citing *id.* at 50-75.)) She also considered his function report, in which he reported using a cane to ambulate and braces on his right knee and ankle for stability. (*Id.* (citing *id.* at 195.)) She specifically noted the findings of his physical examinations by medical providers who observed his inability to hop, bend, squat, or rise from a squatting position, his need for

19

assistance when standing or sitting, and the decreased ranges of motion, sensation and strength in his shoulders. (*Id.* at 25 (citing *id.* at 325, 330, 346, 398, 487-89, 516-17.)) She also noted his medication for pain and muscle spasms and the steroid injections for his right knee. (*Id.* (citing *id.* at 325, 487.))

The ALJ concluded that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms", his "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms were not fully supported" by the evidence. (*Id.*) First, she noted that Plaintiff's medical providers "typically" described him to be in no acute distress during appointments, and with some exceptions, "generally" observed him to have normal strength, sensation, reflexes, and motor function, with some exceptions. (*Id.* (citing *id.* at 271, 353, 362, 372, 383, 397.)) They found he had "normal" cervical range of motion and only "mild" posterior cervical tenderness "at times". (*Id.* (citing *id.* at 324, 373, 397, 516).) Although Plaintiff alleged using a cane and braces, the ALJ found that the record showed "no evidence" that these devices were prescribed by medical providers; it instead showed that he did not report using these devices until March 2020, nearly three years after filing his first disability application, and a month after his second application. (*Id.* at 19, 25 (citing *id.* at 516.)) She further noted that Dr. Shade found that Plaintiff had "fair gait and station" and "negative straight leg-raise test results". (*Id.* at 25-26 (citing *id.* at 516-17.)) The ALJ also noted that in March 2018, he reported jumping out of a truck bed, which she considered an "inconsistent" activity with his alleged "degree of limitation". (*Id.* (citing *id.* at 363, 365.)) Based on this evidence, the ALJ properly found that Plaintiff had the RFC to perform sedentary work with "reduced postural duties" and additional restrictions on "overhead reaching, manipulative duties, and exposure to workplace and environmental hazards"

20

to fully accommodate any limitations that he may experience due to his impairments. (*Id.* at 26.) Because the ALJ considered Dr. Shade's opinion in her decision and gave "careful consideration of the entire record", including the medical opinions and prior administrative medical findings in accordance with the requirements of 20 C.F.R. § 416.920c, the RFC determination is supported by substantial evidence. *See Stamm v. Kijakazi*, No. 3:20-CV-02273, 2021 WL 6197749, at *11 (M.D. Pa. Dec. 31, 2021) (finding that because the ALJ properly considered the medical evidence of record and the supportability and consistency factors, substantial evidence supports his RFC determination); *Swingle v. Comm'r of Soc. Sec. Admin.*, No. 6:20-CV-365-ORL-MCR, 2020 WL 6708023, at *5 (M.D. Fla. Nov. 16, 2020) (finding that the ALJ properly addressed the supportability and consistency factors and because his RFC determination was based on medical evidence in record, it was supported by substantial evidence).

Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence, because "no medical doctor has reviewed the rest of the medical evidence of record before the ALJ". (doc. 27 at 12.) At the hearing, the ALJ noted that both SAMCs had found there was "insufficient evidence to assess Plaintiff's impairments and resulting limitations", so she ordered a consultative examination of his various orthopedic issues. (doc. 24-1 at 73-74.) She expressly stated that she would hold open the record to admit this information. (*Id.*) In her decision, she specifically noted that Plaintiff's additional written evidence, as well as "related proffer evidence", was admitted into the record; "[a]fter careful consideration of the evidence", she determined Plaintiff's RFC as supported by the longitudinal evidence of record, his testimony and the discussed medical opinions. (*Id.* at 19.)

Plaintiff appears to contend that a third SAMC should have reviewed the rest of the

21

evidence not reviewed by the first two SAMCs. (*See* doc. 27 at 12.) A hearing officer is only required to request "an updated medical opinion from a state agency medical or psychological consultant when [s]he believes such evidence could change [her] previous findings", however. *Ihde v. Colvin*, 270 F. Supp. 3d 956, 966 (W.D. Tex. 2017) (citing SSR 96-6p, 1996 WL 374180, at *3-4 (July 2, 1996)). As noted, the ALJ found Dr. Shade's examination, which provided the medical evidence for Plaintiff's RFC determination, partially persuasive because it was supported by a physical examination and was both consistent and inconsistent with "other evidence of record", including Plaintiff's limited earnings and his own testimony. (doc. 24-1 at 26 (citing *id.* at 50-75, 168-69, 188-96.)) Because the rest of the evidence was not likely to change the ALJ's findings, she was not required to request an updated medical opinion from an SAMC. *See Ihde*, 270 F. Supp. 3d at 966. Moreover, the requirement to order an updated medical opinion from an SAMC relates to the assessment at step three and not to the determination of a Plaintiff's RFC. *See id.* Because the ALJ was not required to order updated medical opinions by a third SAMC, and she relied on medical evidence in the record in making her RFC determination, her assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Remand is not warranted on this issue.

## C. **Existence of Other Work**

Plaintiff contends that the ALJ failed to establish the existence of other work "in significant numbers" because the ALJ failed to resolve the conflict between the information in the Selected Characteristics of Occupations (SCO) and his impairments as found by Dr. Shade, in violation of SSR 00-4p. (doc. 27 at 16-18.) The Commissioner responds that Plaintiff's argument relies upon

a "wholesale adoption" of Dr. Shade's opinion, which the ALJ properly declined to do. (doc. 29 at 9.)

To be considered disabled, a claimant must have a severe impairment that makes him unable to perform his previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including the DOT (and its supplement, the SCO) and VEs, to determine when presumptively-disabled claimants can perform alternative and available work. *See Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 608 (E.D. Tex. 2009). The DOT and the SCO "comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs." *Duncan v. Saul*, No. 3:19-CV-1333-S-BH, 2020- WL 6120472, at *13 n.8 (N.D. Tex. Sept. 10, 2020), *report and recommendation adopted*, No. 3:19-CV-1333-S-BH, 2020 WL 6064359 (N.D. Tex. Oct. 14, 2020). The Commissioner recognizes the DOT/SCO publications as authoritative,

23

and routinely relies on them "for information about the requirements of work in the national economy." *See* SSR 00-4p, 2000 WL 1898704, at *2. He may also rely on VEs, who assess whether jobs exist for a person with the claimant's precise abilities and help to determine complex issues, such as whether a claimant's work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ may rely on the testimony of a VE in response to a hypothetical question[13] or other similar evidence. *Newton*, 209 F.3d at 458; *Bowling*, 36 F.3d at 435. SSR 00-4p[14] requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE and information in the DOT. *See* 2000 WL 1898704, at *1-2. As part of her duty to fully develop the record, the ALJ has an "affirmative responsibility" to inquire of the VE on the record whether there is such an inconsistency. *Id.* at 4; *see Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted).

A direct or obvious conflict may arise when the VE's testimony regarding the exertional

---

[13] "The ALJ relies on VE testimony in response to a hypothetical question because the VE "'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)). A hypothetical question posed to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ, and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

[14] Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00-4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *See* SSR 00-4p, 2000 WL 1898704 (S.S.A. 2000). SSRs represent "statements of policy and interpretations" adopted by the SSA that are "binding on all components" of the SSA. *See* 20 C.F.R. § 402.35(b)(1). While binding on the SSA, these interpretive rulings are not binding on the courts and need not be given the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam). Courts may "rel[y] upon the rulings in evaluating ALJs' decisions", however. *Myers*, 238 F.3d at 620.

or skill level of a particular job is facially different than what is indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT. *See Carey*, 230 F.3d at 147. The ALJ must resolve a "direct and obvious conflict" between the VE's testimony and the DOT by determining whether the VE's explanation is reasonable and thus more reliable than the DOT. *Id.* at 146. "[I]mplied or indirect conflicts" occur when VEs are called to testify as to an individual claimant's capabilities. *See id.* at 146-47. Because the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for "implied or unexplained conflicts" and then present the conflict as reversible error. *See id*. Where implied or indirect conflicts exist between a VE's testimony and the DOT, the ALJ may rely on the VE's testimony as long as the record supports that reliance. *See* SSR 00-4p, 2000 WL 1898704 at *4; *Nichols v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-651-G-BF, 2011 WL 2669056, at *6 (N.D. Tex. June 10, 2011) (when indirect conflict did not undergo adversarial development at the administrative hearing, the VE "testimony may be relied upon without resolving the conflict as long as the record reflects an adequate basis for doing so") (citing *Carey*, 230 F.3d 145-46)), *adopted by* 2011 WL 2669099 (N.D. Tex. July 6, 2011).

As discussed, the ALJ found that Plaintiff had the RFC to perform sedentary work, limited to occasionally push and/or pull; occasionally reach overhead and frequently in other directions; frequently handle; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch, but never crawl; and avoid exposure to extremes of heat and unprotected heights. (doc. 24-1 at 23.) At the hearing, the ALJ described a hypothetical individual of Plaintiff's age, education, past work experience, and same RFC. (*Id.* at 70-71.) The VE testified that this individual could not perform Plaintiff's past work but could

perform sedentary, unskilled jobs, including document preparer, food and beverage order clerk, and call out operator. (*Id.* at 71-72.) When the ALJ expressly inquired as to whether his testimony was consistent with "the [DOT] and its companion publication", the VE responded that his testimony was "over and above" what the DOT covered because the off-task behavior, the absences, and the overhead reaching were not addressed by the DOT, and that it was based on his education, experience, and training. (*Id.* at 72-73). The ALJ determined that Plaintiff had the RFC for a limited range of sedentary work, and relying exclusively on the testimony from the VE, found at step five that Plaintiff was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy," such as a document preparer, food and beverage order clerk, and call out operator. (*Id.* at 71.) Because the ALJ expressly sought evidence at the hearing that the VE's testimony was consistent with the DOT and the SCO, Plaintiff fails to show that the ALJ did not comply with SSR 00-4p. *See Graves*, 837 F.3d at 593 (noting that there is no violation of SSR 00-4p if the plaintiff fails to show the VE's "testimony was actually inconsistent with the DOT").

In support of his argument, Plaintiff references the SCO, which provides that two of the jobs identified by the VE—i.e., document preparer and food and beverage order clerk—"require" that he reach on a "frequent" basis, which is defined as occurring *up to* two-thirds of the time". (*Id.*) (emphasis added). This information in the SCO, he contends, conflicts with Dr. Shade's opinion that Plaintiff could never "lift or carry 10 pounds", "reach overhead with the bilateral hands", "reach in all other directions with the left hand" or "reach with either arm to even 80 degrees on flexion or abduction". (*Id.* at 17-18.) First, as noted, substantial evidence supported the ALJ's decision not to adopt Dr. Shade's opinion in its entirety, including any limitations on

reaching, and instead, properly found it partially persuasive, because, as noted, it was both consistent and inconsistent with the evidence of record. (doc. 24-1 at 26-27.) Because the ALJ properly analyzed Dr. Shade's opinion under the 20 C.F.R. § 404.1520c(c)(1)-(5) factors, including consistency, she was "free … to decide not to adopt Dr. [Shade]'s conclusions about Plaintiff's RFC". *See Colorado v. Saul*, No. EP-20-CV-00200-FM, 2021 WL 8053505, at *4 (W.D. Tex. Feb. 11, 2021). Contrary to Plaintiff's claim, the ALJ has no duty to resolve any conflict between the SCO and Dr. Shade's opinion because the duty only applies to certain conflicts between the SCO and the *VE's testimony*. *See* SSR 00-4p, 2000 WL 1898704 at *4; *Carey*, 230 F.3d at 146. To the extent that Plaintiff argues that the ALJ erred because she did not resolve the conflict between the SCO and VE's testimony, there is no direct and obvious conflict between the two. District courts in this circuit have concluded that frequent reaching "can be in any direction" and "the DOT does not describe any job duties that would *require* overhead reaching." *Joseph B v. Saul*, No. 4:19-CV-1285, 2020 WL 7024310, at *9 (S.D. Tex. Nov. 30, 2020) (emphasis in original) (citing *Tracy D v. Comm'r of SSA*, 2019 WL 47478124, *3 (N.D. Tex. Sept. 27, 2019); *Rodriguez v. Colvin*, 2015 WL 778852, *4 (W.D. Tex. Feb. 23, 2015); *Ridenhour v. Astrue*, 2009 WL 77765, *13 (N.D. Tex. Jan. 12, 2009); *Calvert v. Comm'r of SSA*, 2019 WL 1317313, *3 (N.D. Tex. Mar. 22, 2019)). Similarly, Plaintiff does not argue that any of the three jobs identified by the VE requires two hands. *See id.* (citing *Carey*, 230 F.3d at 146) (finding no conflict because the DOT did not state that the job required two hands).

Even assuming the existence of a, implied or indirect conflict between the VE's testimony and the SCO, Plaintiff, who was represented by an attorney at the administrative hearing, neither identified any conflict at the hearing nor examined the VE at all, despite being specifically

27

permitted to do so. (doc. 24-1 at 50-75.) As noted, the Fifth Circuit has specifically stated that claimants Plaintiff, "should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. *See Zapata*, 2014 WL 4354243, at *11 (citing *Carey*, 230 F.3d at 142). Nothing at the hearing appears to have triggered any reason for the ALJ to elicit a "reasonable explanation" for any possible conflicts. *See Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-3126-L, 2013 WL 632104, at *13 (N.D. Tex. Feb. 4, 2013) (citing *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp.2d 607, 613-14 (E.D. Tex. April 9, 2009)), *adopted by* 2013 WL 628561 (N.D. Tex. Feb. 20, 2013). Remand is not warranted on this issue.

## IV.        RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 6th day of July, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

29